Case No. 25-1336 and 25-1589 Oldnar Corp v. Sanyo NA Corp at all. Argument is not to exceed 15 minutes per side. Mr. Broadus, you may proceed for the appellant. Thank you. Drew Broadus for the plaintiff, appellant, and cross-appellee, Nartron. I'd like to reserve three minutes for rebuttal. So, when this case was before this court seven and a half years ago, Nartron's counsel began as follows. Sanyo cannot use Nartron's technological know-how for free. Panasonic cannot use Nartron's technological know-how for free. In order to affirm the district court's decision, you must conclude that both law and equity allow for this. And today, we are more or less in the same position, the only difference being we have a dollar now. And how is this possible? It's a tough pill for my client to swallow because the court will recall when it reversed and remanded seven years ago. Well, if we're going to start with the equities, why don't you address the equity that you seem to present as a matter of damages? One theory and one theory alone under the contract that it was 10 percent royalty or nothing or 10 percent royalty or one dollar. Judge Darbo said one dollar. I must say I have some sympathy with that perspective. If you chose not to make a backup argument as to other ways of measuring use at that point. Well, your honor, I disagree that that was the correct outcome, and I think we have to peel back some of the layers of the onion before we can get there. And the first is, am I right that you presented just 10 percent or nothing? Well, that's correct. Our argument was we have a revenue stream that we established with other proofs. And then we referenced another provision of the same contract, which I think is a pretty strong indication of what Judge Darbo said. The standard was a methodology, quote, consistent with the DSA and the party's reasonable expectations and quote. Now, the party's reasonable expectations under the contract would have been 10 percent royalties if the prototype became an actual type that was actually installed in GM's Cadillacs. You can you can argue that that's a proxy or you can. Right. But the contract is clearly contemplating something that was not delivered or used. There's a couple of problems with with that reasoning. One is this was supposed to be their opportunity to propose some other methodology if they thought 10 percent was inappropriate. They could have come back and said the particular know how that we used was worth less than 10 percent. They didn't. They just they just re-argued other issues and said, no, you're wrong. What's your case authority for the idea that when a plaintiff has liability, a liability victory, is that for the other side to develop alternative theories of damages? That's quite foreign to me as a concept. Here's the issue was framed by the district court that way because she said we're going to evaluate a math. We're going to we couldn't agree on a methodology. We never had a method. We never had a damages hearing. We never had an evidentiary damages, which was. I know. Did you ask for one? I mean, yes, this was all we have. We had this plan B damages theory and Judge Jarboe wouldn't let us present it. No, it's not a plan B. It's our plan A that they were free to say that's wrong. But the issue was never before the district court of did we prove damages? And we got pretty far afield from what was supposed to be decided in 2025 when Judge Jarboe issued the opinion for a couple of reasons that that I'd like to address that happened earlier in the case. But. The first of those. Was the use ruling that came out of the July 6, 2022 opinion, because remember, we have equity here, too. When this court sent it back, it sent it back because we had a breach of contract. Let me let me interrupt for just a 2nd, because I think the damages question is really important here. I don't think there's much disagreement that there was. That there was a breach, it's the damages that we're really worried about. So, I think what a chief judge Sutton is saying is that. Without proof that. Natron would have been. Part of a product that was actually bought by. GM and soul that that it's just too speculative. Now, another way I've thought about this, and I'm interested in your, your take on this is it is another way to look at it on the royalties is that. It's not whether Natron would have been part of the final product, but just whether a final product would have been sold at all to GM by any. Any using any supplier. And then the question becomes, if that is the case that there that there that there is a sale, and we know there was a sale. Then the argument is that you're entitled to a royalty on that. Because of use of your know how. In that product, it doesn't matter whether you actually. Natron was part of that final team that sold. It's the fact that it's the final team is using. No, how and that that's the sale. That's why you're entitled to the royalty because there actually was. A sale on the other hand, if there had never been a sale, if if, you know, if if. Samuel had never been successful with GM and getting. Final sale, then I would see that as a nominal damages situation, because there still would be a breach, but there would just not be any damages because there never would have been a sale of anything to. That's another way of looking at it. I'm just throwing that out to you. Yeah, I mean, I agree because if there's no sale, then the percent, there's no percent 10% of 0, 0 and there's no unjust enrichment if they make nothing. But we demonstrated that they did made quite a bit 435M. Assuming that there was a use of know how that was provided by Natron. How it was. I'm sorry, but it was a ruling by the district court that wasn't assuming. Right now, I understand there was a ruling by the district court and I'm assuming that that's correct. Assuming that that's correct. Then how do we measure. The benefit that Sanyo slash Panasonic is getting from the use of that know how. It doesn't seem right to me that it would be 10%. That's just a number that was a royalty number in a contract. But, but why wouldn't it be some lesser amount and then the question is what is the proof of whatever it is. And that's what I was alluding to that was what defendants had the opportunity to do at this briefing stage that led up to judge Jarboe his opinion short of the hearing on damages is we said 10% because we thought that was the best evidence. It's in the contract that these parties agree that we say that 10% is not correct here is any evidence in the record that you can point to that would show what the amount of damages would be. No, and, and defendants had an opportunity to lay that out and I think this falls back on them that when, when we were instructed by the district court to brief methodology, and not yet the damage assuring gun that never took place. Defendants really didn't seize on that opportunity. We had, you know, we had evidence of how much they had made the revenue stream we had we pointed to the contract and said this isn't a reasonable very reasonable read of the contract to read all parts of it in harmony and and you know not avoid an absurd result that would leave us with no remedy under 9.3 and defendants just kind of said well we really don't agree with the liability finding, and you're going to lose that the damages hearing that ever took place was essentially their arguments. Well, did you ask, I may be repeating a question one of my colleagues asked but did you ask for an evidentiary hearing beyond what. Yes, it's right at the end of our conclusion of our methodology brief, which is ECF I believe that's in that 509. And then we had a reply. What did what did Judge Jarboe say in response to your request for an evidentiary hearing is this take you back to the 10%. Well just Jarboe does because just Jarboe read the contract, essentially to say if you don't have a licensing agreement. Even though 9.3 was breached you can't get any damages. And this related to an earlier, this is a, there's a couple of pieces as possible what happened was we got our opinion in July 6 of 2022. About three weeks later we get a different opinion for Jarboe on the case that kind of sort of out of nowhere says, you're not going to get a royalty because of your part wasn't in the queue. Setting aside any of the know how stuff just saying the part wasn't yours, you can't get a royalty. And that was contrary to actually footnote one of the 7622 opinion so it was kind of nowhere and then Judge Jarboe interpreted that as being law of the case. I don't, that doesn't really follow because there was no intervening appeal she was free to revisit not revisit that. And she chose not to but for a reason that really didn't apply. So that's where kind of some of this error seeped in over time is, you know, we get a ruling that nobody really understood where that came from that suddenly royalties off the table. And so we in our methodology brief explained no royalty should be on the table or other fee is also critical that there's an or other fee language there in 9.3. So what use did Sanyo slash Panasonic make of your know how. Well, we had the testimony from does Malik, Mr does Malik, who took apart, one of these devices and he laid out four ways that it essentially mirrored or echoed the designs that we had proposed earlier on. And, and did he say that those were things that were not, you know, either patentable or not public already because that that also seemed to be a bit of a weakness here. Well, but that led to the holding that there was breach that was all in support of the breach holding that that is no cross appeal from that. I mean, the district court unequivocally said that they made use of our trans know how that was unauthorized provide the idea for the project how the technology would work I'm quoting or paraphrasing the district courts. Right, right. This is all up to November 09 right when when they shift prototypes right right which we also, we think that's we have errors with that that's in the brief and I don't think I have time to get into it. Can I just one quick thing, assuming at Mel, because they had four or five people, helping them come up with a prototype to sell a GM at Mel, of course, is the winner. For the sake of argument at let's assume at Mel had the same contract. If you're right, is it true that they would get 10% royalties, and you would get 10% really so in other words 20% royalties. Am I right about that just I don't know I have the worst respect. Assuming it was a hypothetical, assuming it's the same contract. Would it then be 20% royalties. It could be 10 to you right. It could be if they made that promise to another entity. Sure. Then, you know, they, they get a smaller piece of the pie. It's similar to like an attorney fee if you cut in a referral attorney, you know, you get a third of a third and, you know, it gets smaller but that's what you contract for that you contract for. I don't know why I'm else deal was that something maybe they could develop on remand, if they think that there's an issue there with them having to pay for it twice. How do we know that at Mel system copied yours. We had the, the, the testimony of does Malik was was at the liability phase that's that's what we think carried the day when the judge found this again. There was a finding by the district court not appealed on the fact that they did use our know how. In this, in this queue, a teacher said, would you allow me to ask 1 more question? Oh, yeah. Yeah. Go for it. I just have a question. About the complaint, and it came up because as I was reviewing our prior decision. It appears that there are 2, at least 2 versions of the of the development and supply agreement that were attached to the complaints. And the version we used, I believe, was attached to the 1st amended complaint. But there seems to be another version that was attached to the 2nd amended complaint and also seems to be the same as was the original complaint. And both of these versions are signed by the parties. On April 2nd, 2008. So, I was confused. I can hopefully clarify your confusion, but I don't know where this exhibit is all from, but the 1 that I believe we're all operating on is. 32 to page 299, the same document appears again at 329. I've been 1 page 5 to 5. Okay, that is the 1 we used for the prior. For the prior panel decision. I believe so, because the 1st is very case and the 2nd 1 is closer. I can tell it's an exhibit 7. But my, my question is what accounts for these other versions, or at least 1 other version of the. Development and supply agreement that's signed by the parties. I can't explain that your honor I wasn't aware there was 2 if the. Court thinks that's dispositive I'd like an opportunity to. I can file a short supplement on that. I don't know if it's dispositive or not, but I just think it's very curious that there are 2 versions of the. Same contract that we're being asked to interpret. I think the 1 where I think we're all talking about the 1, you'll find it the 329 1. Page 2 to 5. Judge more judge Bush, do you have any other questions? No, no. Okay. You'll get your full rebuttal. I will hear from the other side. Okay. You're on mute.  There we go. Can you hear me now? Yeah. Sorry about that. Okay. Technology is a little bit. Interesting. Let's put it that way. John Andy, on behalf of senior of America and of North America and kind of sonic of North America. There were questions about use. There were questions about damages. And really, there were questions about essentially approximate cause. And then there were questions about, you know, what is the bridge between use and damages? And I just, I'd like to start because context matters. Can you just address my question at the very end? Do you know which complaint? What, which development and supply agreement we're using here? Yes. The 1 that I'm looking at, that's part of the record is the 1 that is assigned by. John, it has a second signature. And it is dated. He says, John, he received this agreement on January 29th, 2009. Now, I don't know, frankly, there's no record to explain why that was the case. But clearly signed it in April of 2008. We know that. And John has a signature on the document that's reflected that date. This was not really a subject of evidentiary proofs at the time of the hearing. Yeah, I just, I just find it curious that you have that attached to 3 different or at least 2 different pleadings. There are 2 different, 2 different contracts. They're slightly different, but they both have signature pages that seem to look the same. And I have the 1, the 1. Yeah, the 1 that's part of the record right now has the 2 signatures dated 4 to 08. And then a signature with a handwritten note, which presumably came from neurotrans file that said, John was received this on January 29th, 2009. So. Okay, so that's what I can do for a judge. Okay. Thank you. Yeah, council council. I know you might want to go here or there, but if you could just respond to your friend on the other side. So, we have a liability finding for pre November. Oh, 9. right. And then 1 dollar of damages and he's right. I suspect the panel know what no 1 would have thought it was going to lead to nothing. Um, but he says, you know. As I read judged or both, she says, hey, you're giving me this 2 options. You know, Donald damages or 10% and if that's what you're doing, I don't think 10% works. So I'm going to give you 1. now. He says that's not really what happened and that they did seek a damages hearing and judge refused to hold 1 and they had these other theories. And she refused to hear them out. What happened? Yeah, I'm unaware of these other theories, because there is only 1. The theory advanced by was 10% or nothing. It was an all or nothing proposition. That was the only position they took going into the briefing on what what what the other side is called the architecture for damages. But ultimately, the architecture that they provided had no factual foundation. That was the problem that judge said. She said, look, I've got no factual basis to award royalty damages when you point to 5.2 when there's no product that contains that was produced with your technology. By the way, so you don't need to go into all that. We understand. I just want to make sure your view is there was no other alternatives. No, no, no. And it was okay. So, so we'll go. Let's shift to post. 1109, where suddenly there is no more use. Doesn't that seem a little counterintuitive? I mean, it's true there. They've shifted to a new prototype. But, you know, if there's a liability finding of use up to then. Doesn't seem likely that there's some use after that. Well, here's here's the reality. Judging it really boils down to benefit of the bargain, which is what this court instructed on remand. The benefit benefit of the bargain is found in the DSA and what does it say? It says that if you if we and 5.2 says it, if we agree, if we work together and secure a product that we can sell to the to to an OEM, you get 10% royalty. It also says that the actual and incidental costs that are incurred by each side in connection with developing that technology are to be born by each side. Section 3 of the DSA. So, I'm only speculating. I'm not the lawyer for Nartran, but, but, but they admitted in a file in which we've recited to the court in our brief that, in fact, they can they can't get any other type of damage except for royalty damage because they've waived it by contract. So, if we're really talking about benefit of the bargain, the benefit of the bargain is they agree. Why would you say I wouldn't read the contract to take a stand on this? I thought your best argument was royalties doesn't work, but it still leaves possibilities of other measured measures of use damages. Judge, I'm I'm only I was responding to your question about why that doesn't seem intuitive. And my my only point is, I agree. We think there may have been some other form of damage, although those forms of damages would normally be actual or incidental damages. And the benefit of the bargain into this contract is that Nartran agreed to eat those. Did the parties ever get to the point of had there been use liability after November? Oh, nine. What the measure of those damages would have been? No, no, because the court we had taken the position, obviously, at the evidentiary hearing that there was no use of their technology. And that was based on the fact that they had claimed in the in the operative complaint. Listen, I just want to make sure it's a very simple question. I get your point that liability comes before damages. I'm just curious if there there's only one measure of damages theory for pre November. There was anything that suggested it was going to be the same theory after November. That's there's nothing on that either way. OK, no, no, no, no, no. Your opponent has argued that that this testimony of Desmolik shows that there was use made of Nartran's technology by Sanyo. And how do you respond to that? Well, I have just my testimony because I thought this might come up. Nartran doesn't say that its design choices are embodied in the queue. Doesn't say that. I'll put aside for a moment that design choices is their third theory of recovery. Their operative complaint says their system would be embodied in a product. And that was their touch screen system, which it is not. Their second position was that the queue is the functional equivalent of their system, which they also abandoned. And now we have this design choice theory, which comes up right before the evidentiary here. Here's what Desmolik says. Question. So these four things that you've identified, there were four design choices. Were those four design features reflected in a prototype in prototype items provided by Nartran to Sanyo for their use and study? Answer. Yes. Now, what else do they say about these ideas? They don't say they're in the queue. And really, they couldn't say that they were in the queue. My understanding is that their theory is that the ideas were utilized by Atmel and that that is what they should be being compensated for. The use of their ideas, which were in the prototype that was sold as a physical good. And then the use of the ideas by Atmel later on to get the contract with GM. Well, first of all, the use of an idea under the contract says use of a product sold on OEM. Use in the context of unjust enrichment and general intellectual property law says that the idea has to be concrete and usable. We don't have they did not give us usable design choices. That's what the judge found. She found that what evidence do you point to to show that they're pointing to Desmolik? What would you point to on your side? The evidence on our side is that the testimony of the engineers who are working inside of San Diego, USA, made it very clear that this technology was not suitable for production. And and the judge relied on that testimony because those witnesses were credible. And, of course, we're talking now about that evidentiary hearing where she judged the credibility of witnesses and concluded that, in fact, as of November of 2009, the technology of Natron was no longer used because it was inapt for use in the queue. And the other thing that I can point to is that the prototype itself was not appropriate for scaling and production. How do we know? Because it included a circuit the size of a 5 by 8 car. You don't get that in an automotive. Is there any proof in the record that Natron could not have produced a product with Sanyo that GM would have bought? Yeah, there's proof that our people testified that they could not produce a product. Sure, there is absolutely proof that the lead the lead member of the team, Reed Sigaty, testified as follows. And answer their question of the judge, by the way, was the Natron technology ready for production? Answered unanimously. My engineering team's answer was no, it wasn't ready for production. And that was one of the reasons it wasn't chosen. Not only was it cost and time, they couldn't make it work. They didn't know enough about it to make it work. But if hypothetically, if Natron was the one who had the idea. And it was Atmel who figured out how to miniaturize it. I realize I'm oversimplifying. Why shouldn't Natron be able to get some recognition of the use, hypothetically, of their idea? Well, first of all, the idea wasn't owned by Natron. The idea was not owned by us. Why does the idea have to be owned? The terminology is called know-how in the contract. Yes. Why is ownership necessary for there to be know-how that's being. Because that was the remand order. That was the remand order, Judge. I don't recall putting that in the order, that it has to. Well, it says it's where the intellectual property is owned by them. Okay, fair enough. Yes. The contract itself uses the word know-how. Yes. So that is different. That's separate from trade secret. Yes. So that suggests it could be some sort of knowledge that's not necessarily embodied in what we would call a trade secret. And does not necessarily have to be proprietary to Natron, does it? Yes. These are all hypotheticals. I mean, the contract clearly envisions that whatever know-how was being shared had to be. Natron could have an idea that it shares with Sanyo. And that idea could have also been held by Amtel. But still, it would still be know-how under the agreement, wouldn't it, if Sanyo didn't know about it? If it's something new to Sanyo, it doesn't really matter whether Amtel knew about it or not. It's new to Sanyo. Because the contract says Sanyo is not supposed to use the know-how of Natron. Well, Judge, in the first instance, if you don't buy my argument that the DSA envisions that the know-how must be used in a product that's sold to an OEM, meaning that it's usable, if you don't buy that, then in the hypothetical that you pose, okay, maybe there is some idea that up till November of 2009 is an idea of Natron's. Does that mean it's worth 10% royalties? The court said no. Did the other side give them another option to find another path to damages? The answer is no. Why didn't they do that? I'm not the lawyer for them. All I know is what the contract says. The contract says unless you have usable know-how that's embodied in a product and sold to an OEM, you don't get royalties. I also know that when it comes to development costs of those ideas, Section 3 of the DSA says Natron and Sanyo bear their own costs. That's what I know. Just because someone is not entitled, hypothetically, if we're buying your argument, not entitled to royalty, to the 10% royalty, does not mean that therefore they're home free and you're home free and you don't have to pay anything for an idea, for know-how, that was the key to your success, hypothetically. That is hypothetical, Judge. And the response to that is, well, wait a minute. We're not the plaintiff here. We don't have the burden of proof. Not only does the plaintiff now point to us and say we should have come forward with a measure for their damages, which is, as Judge Sutton pointed out, is not the law. They even pointed in their brief to say that the judge should have come up with its own theory about damages. What? She's a finder of fact. All right. Melissa, are there other questions? No. Okay. Let's hear rebuttal then. Thank you, Your Honor. Just to clarify, one of your questions, Judge Sutton, about other theories, to clarify, I'm not saying we had another methodology for ascertaining damages. What I'm saying is the defendants had an opportunity to disagree or put forth some other method. And what I'm also saying is there was, I think all the parties, the parties in the court at that time understood there was going to be another hearing, evidentiary hearing, on whether the damages were proven. It's how you prove them versus whether they're proven. Is your theory of damages, if you win on use after November of 2009, going to be the same 10% royalty? Yes. It's the same. Okay. Yes, because it's the best, it's the best evidence of what the parties would have expected. And that kind of rolls into my, you know, my summary of the, I think the three major errors here. I think the use ruling is a real problem. I spilled a lot of ink on it. I mean, that does get, I mean, it is, there's some deference to the trial court on this, right? I mean, I'm not sure that's a fact finding, though. I think that's a legal determination of what it means to use. The end of the contract is not the end of use, necessarily. And I don't think there's, that's something that a witness or talks about or a document proves. I think that's just inherent in what it means to use an idea. I agree the meaning of use is a legal question. How did she, quote, misuse that word? She just decided that, well, if you stopped using them in November of 2009, they couldn't have possibly used your know-how after that. And that's just contrary to how know-how works, if you have an idea out there. Yeah, but she relied on a lot of witnesses, too. That wasn't just a pure legal ruling. For that particular part of it, I'm not sure she did. I think that, again, you know, I've only got 80 seconds, and I think I've briefed them. I don't know what more I can add to that. But I just want to say there's that. The royalty, how the royalty became off the table is, you know, it's a problem that it sort of slid into an order, and then Judge Jarboe kind of adopted that. And then, ultimately, the reading of 9.3, that it couldn't possibly reference 5.2, is just contrary to general principles of contract interpretation. You read it as a whole. You try to harmonize it. You try to avoid absurd results. And finally, we haven't talked about Rule 68 and the attorney fees. If the court reverses, it's not an issue. I hope it's not an issue. But if it is, if the court's going to address it in this opinion, I think the Supreme Court decision versus choice is dispositive. I don't think it was a particularly close call before. I think it's definitely not a close call now. The state court rule doesn't apply. Do you all have any questions about fees or anything else? No. No. Okay. Well, I think we're done. Thank you very much to both of you. Thanks for accommodating our virtual hearings. I suppose this is the benefit of allowing you to do it a little more quickly, so we appreciate it. Thanks for your helpful briefs and arguments. Thank you. The case will be submitted.